**FILED
CLERK**

4/18/2019 8:54 am

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
CONCEPCION HERNANDEZ, et al.,   *   Case No. 17-CV-00887(JFB)
                                *
              Plaintiffs,       *   Central Islip, New York
                                *   June 19, 2017
     v.                         *
                                *
MARCOFAI CORP., et al.,         *
                                *
              Defendants.       *
                                *
* * * * * * * * * * * * * * * *
```

TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE GARY R. BROWN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:       SARA JACQUELINE ISAACSON, ESQ.
                         Michael Faiillace & Associates
                         60 East 42nd Street, Suite 4510
                         New York, NY  10165

For the Defendants:      SIM R. SHAPIRO, ESQ.
                         Baxter Smith Shapiro, P.C.
                         200 Mamaroneck Avenue
                         Suite 601
                         White Plains, NY  10601

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.
4 Research Drive, Suite 402
Shelton, Connecticut 06484 (203)929-9992**

1       (Proceedings commenced at 10:36 a.m.)
2              THE CLERK:  Calling case civil 2017-887, Hernandez
3   vs. Marcofai Corporation, et al.
4              Counsel, please state your appearance for the
5   record.
6              MS. ISAACSON:  Sara Isaacson, from Michael Faiillace
7   and Associates, for plaintiffs.
8              THE COURT:  Ms. -- sorry.
9              MS. ISAACSON:  Isaacson.
10             THE COURT:  Spell it for me, please.
11             MS. ISAACSON:  I-S-A-A-C-S-O-N.
12             THE COURT:  Very good.  Have a seat. Make yourself
13  comfortable.  Make sure you use the mics, because it's the
14  only way we can hear each other and make a record.
15             Counsel?
16             MR. SHAPIRO:  Good morning, Your Honor.  Sim
17  Shapiro, from the law firm of Baxter Smith and Shapiro, White
18  Plains, New York, on behalf of defendants, Marcofai, Martin
19  Lebedin and Cora Lebedin.
20             THE COURT:  Excellent.  Have a seat.  Make yourself
21  comfortable.  Again, make sure you use the mic because I do
22  not want to miss a single syllable you have to say.
23             Counsel, tell me about the case.
24             MS. ISAACSON:  This is an FLSA case brought --
25             THE COURT:  If you must stand, you can use the

1   podium.  There's a standing mic there, but please make
2   yourself comfortable.
3               MS. ISAACSON:  Okay.  Thank you, Your Honor.
4               This is brought by -- a collective action brought by
5   two plaintiffs currently for unpaid wages, mostly overtime
6   wages.  They were flower arrangement designers for a flower
7   shop in Hicksville, New York.
8               So the parties have conferred. We have set forth
9   some dates for the discovery plan worksheet, as per your
10  order.
11              THE COURT:  I'll come back to that in a moment.
12  That's good.
13              But I want to know a little bit more about the case.
14  You said a collective.  Is it a collective and a class?  Did I
15  read that correctly?
16              MS. ISAACSON:  We brought it -- yeah.  We brought it
17  under a collective and a class, but --
18              THE COURT:  Do we have any way of knowing at the
19  present how big that group might be, whether we call it
20  collective or class?
21              MS. ISAACSON:  At the moment, we don't anticipate
22  joining any more plaintiffs, but we would like about 30 days
23  just to confer with our clients and make sure, but we're
24  anticipating only the two named plaintiffs.
25              THE COURT:  That's very helpful.

4

1          Now, with respect to the two named plaintiffs, have
2  you at this point come up with some sort of estimate of what
3  you think the losses or damages are?
4          MS. ISAACSON:  We are working on the damages chart
5  currently and I will have that ready shortly for defense
6  counsel so that we can confer regarding our damages chart.
7          THE COURT:  Do you have any idea of what they were
8  earning in this job?
9          MS. ISAACSON:  Yes.  So from approximately --
10 plaintiff Concepcion Hernandez from April, 2011 to December,
11 2014 was earning approximately $15 per hour and she was
12 working basically that time around the holidays for about 119
13 hours a week.
14         Then from January, 2015 to February, 2017, she was
15 earning about $18 per hour and when she -- around the holiday
16 times again she was working about 119 hours per week and
17 otherwise about 60 hours per week.
18         With regards to plaintiff Maria Hernandez, she was
19 earning about $15 per hour from May, 2011 until May, 2013.
20 And then from May, 2013 to September, 2015 she was earning
21 about $15.50 per hour.  And then from September, 2015 until
22 the end of her employment in February 8, 2017, she was earning
23 about $16 per hour.
24         And then during that time period she was working
25 about 44 hours per week, except for around the holidays.  It

1    was around 112 hours per week, Your Honor.
2            THE COURT: Okay. So is it fair to say then that
3    we're talking in the area of $15 an hour and if I heard you
4    right, about two years for each of these plaintiffs?
5            MS. ISAACSON: It should be a little bit -- it
6    should be longer than that because they worked from 2011. So
7    it should be the six-year period, because we're bringing it
8    under New York Labor Law as well.
9            THE COURT: Got it. Got it. No, no. I thought they
10   only worked there for two years. I thought that was what you
11   were suggesting to me. But you're saying 2011 through -- and
12   they're not working there anymore.
13           MS. ISAACSON: Right. They both ended their
14   employment around February, 2017.
15           THE COURT: Okay. So we got the six year period
16   more or less.
17           There are no, obviously -- well, I shouldn't say
18   obviously. It doesn't sound like there are minimum wage
19   violations, or am I wrong?
20           MS. ISAACSON: Right. It's mostly going to be an
21   overtime --
22           THE COURT: It's an overtime case.
23           And do you have the penalties for no posting or not
24   giving --
25           MS. ISAACSON: Yes. Yes, we have that as well. We

6

1 have brought those.

2 THE COURT: All right. Okay. I mean, each one of
3 us I'm sure just did a mental calculation to come up with a
4 ballpark idea of what we're talking about but Mr. Shapiro, let
5 me hear from you.

6 MR. SHAPIRO: Good morning, Your Honor.

7 THE COURT: Good morning.

8 MR. SHAPIRO: I actually had asked Ms. Isaacson the
9 same question, and I believe her colleague as well, which was
10 what exactly are we talking about in terms of the damages.

11 Of course, to be clear, my client disputes the
12 claims, but we want to know what the damages were --

13 THE COURT: I'm not holding anybody accountable.
14 We're just talking about possibilities here.

15 MR. SHAPIRO: Absolutely. So we also are anxiously
16 awaiting that information as to what exactly are the claims.
17 Above and beyond that, I do note this is the first -- in
18 conversations we've had.

19 I've read the complaint, of course, and have
20 answered it. The possibility of in the next 30 days, based on
21 conversations with the clients of potentially new plaintiffs.
22 Obviously, that would impact that discovery schedule that
23 we've generally agreed upon from our end.

24 THE COURT: That doesn't sound like a likelihood,
25 right? That sounds like an outside chance.

1 MR. SHAPIRO: I don't know. It's the first I'm
2 hearing of it.
3 THE COURT: Well, that's what counsel suggested to
4 me. I mean, she has the right to investigate it, but it sounds
5 like it's going to be primarily these two individuals.
6 That said, there's still some bad news for your
7 client here, right? In other words, if what she just said to
8 me is fully accurate, we're talking about hundreds of dollars
9 per week in missed overtime payments potentially for a long
10 period of time for -- it's still a big number, right?
11 MR. SHAPIRO: Understood, Your Honor.
12 Obviously, we dispute that but to me the reason I
13 mention it is because we have an agreed upon discovery
14 schedule in accordance with Your Honor's rules.
15 THE COURT: Right.
16 MR. SHAPIRO: From our end, those dates potentially
17 would change if, in fact, we're adding more plaintiffs.
18 THE COURT: Got that piece. But let's assume that's
19 not even out there. We still have a significant case and the
20 answer to my next question may read significantly on how bad
21 that news is.
22 How are you on time records?
23 MR. SHAPIRO: How are we in terms of the records
24 that we have in terms of their time?
25 THE COURT: Do you have time records?

8

1    MR. SHAPIRO: I've asked my client to obtain what
2 they have.
3    THE COURT: Ahh. And I might suggest -- am I led to
4 believe that you think that that exercise may not be all that
5 fruitful?
6    MR. SHAPIRO: I don't know the answer to that
7 question at this time, Your Honor.
8    THE COURT: Okay. If experience is a guide, it's
9 rare that I have a case of this nature where someone ways
10 yeah, well, we've got all the time records. We've got punch
11 and punch out's and -- it's rare. Maybe you've got a rare
12 case. That would be good for you.
13    But most likely no, and then we know where we are,
14 which is big potential liability, significant difficulty
15 defending the case, if there are no time records. I'm just
16 laying out a possibility here.
17    Then there would be issues, I imagine, of
18 collectably, and we'd have to talk about that. Is that fair?
19    MR. SHAPIRO: I'm sorry, Your Honor. Again, I'm not
20 hearing so well from here.
21    THE COURT: I'm so sorry.
22    MR. SHAPIRO: There would be issues of --
23    THE COURT: Collectability. In other words, you're
24 going to say well, if she get an $800,000 judgment. I'm
25 making up a number out of whole cloth, but with the doubles --

9

1   double damages under the federal and state rules, right?
2   Attorney's fees, penalties and so forth, it's easily a six
3   figure number.
4           My question to you would be would that be a
5   collectability issue with regard to your client?
6           MR. SHAPIRO:  Again, that's an issue that I would
7   have to address with my client. I don't have an answer to that
8   question today.
9           THE COURT:  Well, you have to address it soon, and
10  here's why.  Because in my experience, that's the number one
11  go to issue in these cases.
12          In other words, that's nice, Judge.  It's nice that
13  in theory we might owe them $600,000, but we're not going to
14  be able to pay it.
15          What I'm going to ask you to do is satisfy counsel
16  on that point, because we can't settle the case with your
17  client suddenly deciding that they have financial issues based
18  on the size of the award. We have to document that.
19          In other words, her clients can't accept something
20  below a certain level without being satisfied that, in fact,
21  your clients don't have the money.  Understood?
22          MR. SHAPIRO:  Understood, Your Honor. I do believe
23  that there's more to this case than meets the eye, so --
24          THE COURT:  Listen. Okay.  Forgive me.
25          I asked about the time records.  You said you didn't

10

1  know.  Fair?  You asked your client or no?
2             MR. SHAPIRO:  Yes.
3             THE COURT:  Do you have a defense?
4             MR. SHAPIRO:  I'm sorry, Your Honor?
5             THE COURT:  Do you have a defense?
6             MR. SHAPIRO:  Again, we're investigating it but yes,
7  we do have defenses, Your Honor, including --
8             THE COURT:  What are the defenses?
9             MR. SHAPIRO:  I think that what this really involves
10 is a dispute with the two plaintiffs involving the termination
11 of their employment.
12            THE COURT:  Of course it does.  It always does.  But
13 do you have a defense to the underlying claim that your client
14 was not carefully paying overtime?
15            MR. SHAPIRO:  I believe we do, Your Honor.  As I
16 mentioned --
17            THE COURT:  What do you think the defense is?
18            MR. SHAPIRO:  I believe all requirements were met.
19 Again, I've asked my client to investigate to obtain the
20 records that they have so as an officer of the court I'll
21 state I think that there's quite a bit of a reason to dispute
22 to this, but I'm awaiting more information.
23            THE COURT:  But counsel, understand, when I ask that
24 question I don't know anything about the case.  Right?  You
25 could say to me, Judge, they were managerial level employees

11

1   and they were making over a certain -- or whatever?  I mean,
2   there's lots of things.  We don't deal in interstate commerce.
3   That would be funny in this kind of case, but whatever.
4          But usually the answer is there's not much in terms
5   of a defense. Usually the answer is there's not much in terms
6   of records.  And then we have to figure out what's next,
7   right?
8          What I want do is get your clients there to the
9   what's next part of the program as cheaply, and quickly, and
10  efficiently as we can, right, because I've seen these cases go
11  the distance and it's never pretty for anybody.  It costs a
12  lot of money.  This is an attorney fee shifting statute and so
13  forth.
14          It's hard.  So I'm trying to think of ways to get --
15  so one of the way is to say -- the three of us could sit here
16  and actually take out pen and paper and do the math, but I can
17  tell you without doing the math that if counsel is right about
18  the number -- the amount of overtime worked and that it wasn't
19  paid, the potential liability, and I know you dispute it and
20  you have the right to find your defenses and I'm with you,
21  right?  I believe in rights.  That's why I wear the robe,
22  right? But the potential could be a six figure number, right.
23          And if that's going to be a problem, I'm going to
24  want you early on to help counsel understand the
25  collectability *vel non* of a significant judgment  Are we on

12

1 board?

2 MR. SHAPIRO: Understood, Your Honor.

3 THE COURT: Excellent. Thank you.

4 Does someone have a discovery schedule for me?

5 MS. ISAACSON: Yeah.

6 THE COURT: Can I take that from you? These are

7 joint dates, yes?

8 MS. ISAACSON: Yes.

9 MR. SHAPIRO: Yes, Your Honor.

10 THE COURT: Okay. Hand that up.

11 So okay. This -- very nicely done, counsel, and I

12 think the dates are terrific with me so I will enter this as

13 the discovery order in the case. What does that mean?

14 That means that these dates have become -- or will

15 become momentarily a court order. Does that mean you can't

16 change them? Of course, it doesn't mean that.

17 In fact, I expect you to be competent professionals

18 and courteous to each other and if you want to agree on

19 changes, I generally won't have a problem.

20 In other words, you say okay, the 8/18 date we're

21 going to move it to 8/30, I'm fine with it. You file a letter

22 on ECF and say Judge, we agree and generally and magically

23 I'll bang the big hammer over here and it will happen, okay,

24 without you even having much trouble.

25 If you want to change that last date, the February

1    12th, 2018 date, that's the date that I'm monitoring for Judge
2    Bianco, essentially.  In other words, he's going to want a
3    trial ready case at some point.
4             So if we want to change the last date, we need to
5    talk, okay?  There has to be a really good reason which  means
6    if we can't settle this, let's stay diligent and stay on track
7    to get that -- get ready for that date, all right?
8             But let's talk about phase one and I see that you've
9    both embraced my phase one discovery by actually writing out
10   some of the stuff that you're going to turn over.
11            What I want you to turn over is the things you
12   really need to exchange so that you can make an intelligent
13   decision for a potential early resolution.
14            In these cases particularly an early resolution can
15   benefit everybody for lots of reasons.
16            It doesn't mean you have to settle. I can't make
17   anybody settle, but we're going to work really hard to try to
18   get your clients in a position where they can make an
19   intelligent decision concerning settlement, all right?
20            I'm going to do it before we run up too much in
21   terms of the litigation costs and *agita* -- that's a Latin term
22   we use -- aggravation and so forth.  Okay?
23            So you're going to complete phase one discovery by
24   2017 and counsel, my dialogue with you earlier is to the end
25   of part, as part of phase one, maybe you want to sort of show

1    some financial aspects of the company to counsel, if I'm
2    right, and this is not the kind of business that could sustain
3    a six figure judgment, okay?
4             If it is and you don't want to do that, that's your
5    business, but I just point that out to you as another
6    possibility .
7             I often do settlement conferences where we way oh,
8    if only they had shown me that, Judge, I could convince my
9    clients to take this much or whatever.  Up to you.
10            Okay.  So they're going to get ready by 8/18.
11   Karen, can we get these guys a settlement conference date some
12   time thereafter?
13            THE CLERK:  Thursday, the 10th of August or is that
14   too soon?
15            THE COURT:  Could we do a little later?  Let's give
16   them a little more time.
17            THE CLERK:  How about Wednesday, September 6th?
18            THE COURT:  Wednesday, September 6th.  How does that
19   sound?
20            MS. ISAACSON:  That sounds good, Your Honor.
21            THE CLERK:  At 2:00?
22            MR. SHAPIRO:  That should be fine.
23            THE COURT:  At 2 o'clock.  Okay.  Please take a look
24   at my rules concerning settlement. I require you to have a
25   party here with authority to settle.

15

1 Plaintiff's counsel, that's easy. You know who that
2 is. Those are the plaintiffs. You've got to bring them,
3 right? They have to understand what they're getting into and
4 so forth. Defendant's counsel, I don't know who that is for
5 you.
6 MR. SHAPIRO: Well, they've actually sued Martin
7 Lebedin and Cora Lebedin individually. So --
8 THE COURT: They seem like likely candidates, but
9 you can make that decision. In other words, if there's a
10 comptroller who's the right person, whoever it is that should
11 be the right person to really make a real decision on
12 settlement, okay. Up to you. All right?
13 And I also allow you to submit an ex parte letter.
14 You fax it to me. You do not serve it, you do not file it.
15 And in that letter -- and you just do that a few
16 days before the conference. I ask you to just give me your
17 plan for settling the case. Sort of what the range is, any
18 critical facts I need to know. Whatever you learn the next
19 couple of months and a page or two. Nothing big.
20 But you don't serve it, you don't file it, and I
21 assure you I don't turn that information over until you
22 authorize me otherwise. Okay?
23 So that will be the settlement plan. If we don't
24 settle, you've got your discovery plan, so we have a plan to
25 do the litigation, which will be expensive, painful, risky and

16

1 unpleasant.  But we're here to do that for you.
2          Counsel, you have a question?
3          MR. SHAPIRO:  Your Honor, just so I'm clear, it's
4 your expectations that we would do depositions after that
5 settlement conference if we're not able to do settle at that
6 point?
7          THE COURT:  Yes.
8          MR. SHAPIRO:  And just in terms of --
9          THE COURT:  Yes, generally speaking so. I try to
10 keep it lower cost.
11          If you come back to me and say look we need to do a
12 deposition before because this particular issue -- but, you
13 know, I would keep it very limited because I'm trying to keep
14 the costs down, if we can.  If you can't, I understand.
15          Anything else?
16          MS. ISAACSON:  Yes, Your Honor.
17          THE COURT:  Go ahead.
18          MS. ISAACSON:  Defendant's counsel had noted on the
19 discovery plan worksheet that he would be seeking plaintiff's
20 tax returns.
21          So I just wanted to note that we would objecting to
22 any type of discovery on any of plaintiff's tax returns or
23 immigration status, or anything of the like.
24          THE COURT:  Okay.  Let's talk about that now.
25          What do you need the tax returns for?

1    MR. SHAPIRO: Well, they're making claims of
2 damages. We'd like to know what their sources of income were,
3 including their source of income from whatever records they
4 have regarding sources of income from my client.
5    So if they're making the claims that they're making
6 in this case, we'd like to know what those damages are and
7 what they're been receiving.
8    THE COURT: Okay. So basically, what you want to
9 know is what they reported they received from your client.
10    MR. SHAPIRO: Correct.
11    THE COURT: And then since -- if their new
12 employment is 2017, we're obviously doing discovery in 2017,
13 but they've sought and received new employment. So that's
14 relevant as well.
15    MR. SHAPIRO: Well, why is new employment relevant?
16 Because it's not a discrimination case, right? In other
17 words, it's not a termination or a retaliation case, right?
18    MR. SHAPIRO: Again, I think depending on how the
19 complaint would be -- however broadly it would be construed, I
20 think that that would be relevant.
21    I think -- the thing is I don't want to jump ahead
22 of myself. We're only in 2017 so at the moment there's no tax
23 return to seek anyway from 2017.
24    THE COURT: Well --
25    MR. SHAPIRO: But in terms of the years that they

1 were working for my client --

2 THE COURT: So you don't have me at hello, as they
3 used to say, on the new employment. I don't think that gets
4 turned over.

5 But in terms of the old employment, I mean, to the
6 extent that you could either redact, or give them a portion,
7 or something that shows what they reported receiving from
8 these employers, is there an objection to that?

9 MS. ISAACSON: We could try to look into that and
10 see what our clients have.

11 THE COURT: I mean, you could redact the whole thing
12 other than those lines, right? In other words -- and if
13 there's -- because sometimes in these cases there is a blend
14 of cash and checks and so forth. So he may not know what
15 you're reporting, right? So I think that's fair, but limit it
16 in that manner.

17 MS. ISAACSON: Okay, Your Honor.

18 THE COURT: Will that do?

19 MS. ISAACSON: Yes, Your Honor.

20 THE COURT: Okay. And that will do it for you. Yes,
21 counsel?

22 MR. SHAPIRO: Yes, Your Honor. I understand your
23 ruling.

24 THE COURT: Right. But you don't need to know if
25 they took a college savings plan exemption or something.

1          MR. SHAPIRO:  Again, I think the critical piece of
2     it is what Your Honor's directing. I would be interested in
3     the other parts as well, but --
4          THE COURT:  Then start with the critical ones and
5     later on we can fight -- we can agree to fight about that
6     later. All right?
7          Anything else, counsel?
8          MS. ISAACSON:  No, Your Honor.
9          THE COURT:  How about for the defense?  Anything
10    else today?
11         MR. SHAPIRO:  Your Honor, I'm just thinking as to
12    that -- nothing else beyond that.  No, Your Honor.
13         What I would have wanted is an authorization for the
14    tax returns and that way instead of getting them directly from
15    the plaintiffs we'd get them directly from the source.
16         I understand Your Honor's concern about redaction. I
17    would be fine if they were directed to the court.
18         THE COURT:  We're going to do that today.  Let's
19    start there, okay.
20         MR. SHAPIRO:  Okay.
21         THE COURT:  And please bear in mind, the meet and
22    confer rule is the golden ticket around here.
23         In other words, if you come to me with a dispute and
24    you haven't talked to each other first, I'm going to send it
25    away and you're going to talk to each other first.

20

1    So you're going to have to talk to each other, so
2    please try to work things out.  Okay?
3    MR. SHAPIRO:  Yes.  And we have, in fact, conferred.
4    As I mentioned, we conferred on the phone before court today
5    and also with Ms. Isaacson's colleagues.
6    THE COURT:  Yes. I have high hopes for the two of
7    you. I really do. I think you're going to get along just fine,
8    but remember, it's not only a nice thing to do, it's the law.
9    So -- all right?
10   MR. SHAPIRO:  Thank you, Your Honor.
11   MS. ISAACSON:  Thank you, Your Honor.
12   THE COURT:  Have a nice day.
13   (Proceedings concluded at 10:57 a.m.)
14   I, CHRISTINE FIORE, court-approved transcriber and
15   certified electronic reporter and transcriber, certify that
16   the foregoing is a correct transcript from the official
17   electronic sound recording of the proceedings in the above-
18   entitled matter.
19
20   *Christine Fiore* (signature)
21   _____           April 16, 2019
22   Christine Fiore, CERT
23      Transcriber
24
25